# Exhibit B

(Del)

South Carolina

BlueCross BlueShield of South Carolina and BlueChoice® HealthPlan are independent licensees of the Blue Cross and Blue Shield Association.

AGENCY AGREEMENT

☒ BlueCross BlueShield of South Carolina ☒ BlueChoice® HealthPlan

☐ Companion Life is a separate life insurance company that does not provide BlueCross BlueShield of South Carolina products. BlueCross BlueShield of South Carolina does not have any responsibility for Companion Life products.

**AGENCY AGREEMENT**

**☒ BlueCross BlueShield of South Carolina** **☒ BlueChoice HealthPlan**

**☐ Companion Life** - Life insurance is offered by Companion Life. Because Companion Life Is a separate company from BlueCross and BlueChoice HealthPlan, Companion Life will be responsible for all services related to life insurance.

This Agreement is made and entered into between Blue Cross and Blue ShieldBlueCross and BlueShield of South Carolina, Companion Life Insurance Company and BlueChoice HealthPlan and its family of companies (hereinafter referred to as the "Companies"), corporations organized under the laws of the state of South Carolina and having their principal place of business at I-20 East at Alpine Road, Columbia, South Carolina 29219 and

PHILIP ROESELBEST INSURANCE CONTRACTS

PRINT AGENCY or PRODUCER NAME

(Hereinafter referred to as the "Agency"), having its principal place of business at:

5611 WOOD DUCK CIR

WILMINGTON, North Carolina 28409

Throughout this Agreement, Agency is understood to mean all persons associated with Agency, including its owners, partners, shareholders, employees and Producers or sub-agents.

**I. RESPONSIBILITIES OF THE COMPANIES**

In consideration of the Agreements set forth here, Companies grant to Agency the authority and power to solicit applications for insurance with Companies subject to the terms, conditions and limits set forth herein.

The authorization granted to Agency is limited to the territory in which Agency and Companies are properly licensed and authorized to carry out the transactions contemplated. This authority shall be non-exclusive.

**II. DUTIES**

The Agency shall act in the best interests of the Companies, its successors or assigns consumers. Subject to the terms and limitations of this Agreement, Agency agrees to:

1. Solicit and procure applications for life, accident and health, and disability insurance, as authorized by Companies.
2. Deliver policies, assist Companies in servicing its products, and extend such other service to policyholders and their beneficiaries as is proper and customary under Companies' rules and methods of operations.
3. Contract with persons licensed as Producers in South Carolina and, with the Companies' approval, request appointment of these Producers as sub-agents. Where appointment is made through Companies, all commissions will be payable to Agency unless specifically requested by Producer and agreed by Agency. Where compensation is paid through Agency, Producers shall have no claim against the Companies for commissions, salaries, or any other remuneration and all compensation to Producers and sub-agents will be the responsibility of Agency. It is solely the responsibility of the Agency to provide information to Producers concerning the conditions and manner of compensation and to clarify the relationship between itself and its owners, partners, Producers or sub-agents, and employees. Agency will be responsible for all expenses incurred by Agency in connection with activities pursuant to this Agreement, including licensing fees, salaries, travel expenses, benefits, any income or excise taxes, commissions and any and all other expenses of such Producers. Agency agrees, however, that all Producers shall be subject to all the rules, restrictions and regulations set forth in this Agreement, which are applicable to Agency.
4. Deliver renewal notifications in a timely manner, in accordance with South Carolina laws.
5. Provide the policyholder with adequate information regarding benefits and benefit changes to the policy, including conducting enrollment meetings at point of sale if requested by the Policyholder.

**III. RESPONSIBILITIES OF THE AGENCY**

It is understood and agreed that Agency will:

1. Be governed by all rules, regulations and instructions of the Companies, together with the insurance laws and regulations of the state of South Carolina, and any other applicable laws;
2. Treat all money received and collected by Agency for Companies as property held in trust and remit such collections to Companies in accordance with its procedures;
3. Account for all policies, receipts, papers, records and property received by Agency from Companies, its policyholders and representatives;
4. Aid in the care and conservation of Companies' business and provide prompt service to policyholders;
5. Indemnify and hold ~~Companies~~Company harmless from any losses~~.~~, damages, costs and liabilities suffered or incurred by Companies which may be caused by acts, negligence or dishonesty of the Agency, its owners, partners, Producers or sub-agents, contractors, or employees, including breaches of the Business Associate Agreement;
6. At all times during the term of this Agreement:

    a. Keep in force, at Agency's own expense, Commercial General Liability Insurance with a limit of not less than $1,000,000 per occurrence and $2,000,000 in the aggregate for bodily injury and property damage to include personal injury and contractual liability coverage;
    b. Maintain, or require each Producer to maintain, Professional Liability (Errors and Omissions) Insurance for $1,000,000 per occurrence and in the aggregate; and
    c. Provide proof of the above insurance on an annual basis, or as requested by Companies, verifying these coverages and limits. Said policies may not be materially modified or cancelled except after thirty (30) days prior written notice to Companies.
    d. Require Agency's Errors and Omissions issuer to notify Companies at least 30 days prior to cancellation of that coverage or material modification of coverage.

7. If Agency, its owners, partners, Producers or sub-agents, and employees, choose to assist any member, beneficiary or group in the collecting or data entry of information required or requested by Companies, then Agency, its owners, partners, Producers or sub-agents, and employees will be deemed to be are acting on behalf of the member, beneficiary or group.
8. Any errors or omissions while acting on behalf of the member, beneficiary or group will be the sole liability of the Agency, its owners, partners, Producers or sub-agents, and employees.

~~8~~9. The Agency and all subagents are required to sign and return the Business Associates Agreement provided by Companies. Agency understands and agrees that the Business Associate Agreement is specifically incorporated by reference into this Agency Agreement and Agency will ensure that all owners, partners, shareholders, employees, and Producers or sub-agents abide by the terms of that Agreement.

**IV. AGENCY AS A DELEGATED ENTITY**

Agency expressly agrees and understands the following in accordance with 45 C.F.R. § 156.340:

1. In the course of performing the duties and obligations required by this Certification, the undersigned Agency may constitute a "delegated entity," and may contract with other vendors who constitute "downstream entities," as such terms are defined in 45 C.F.R. § 156.20, to assist in performing duties and obligations required by this Certification.
2. Agency shall comply with all applicable laws and regulations, including but not limited to the provisions of 45 C.F.R. Parts 155 and 156, to the extent relevant, in the performing or assisting in the performance of the duties and obligations required by this Certification.
3. Agency shall grant access to its books, contracts, computers, or other electronic systems (including medical records and documentation), relating to Agent's compliance with applicable provisions under 45 C.F.R. Parts 155 and 156 in connection with the duties and obligations required by this Certification, to the U.S. Department of Health and Human Services ("HHS") and its Office of Inspector General (or their designees), for the duration of the period of Agency's appointment pursuant to this Certification, and for a minimum of ten (10) years from the date Agency's appointment terminates.
4. Agency shall include in its contracts with any downstream entities, and require such downstream entities to include in their contracts with other downstream entities, language that is the same or substantially similar to that contained in this Section, and which expressly requires each downstream entity to:

    a. Comply with all applicable laws and regulations, including but not limited to the provisions of 45 C.F.R. Parts 155 and 156, to the extent relevant, in performing or assisting in the performance of the duties and obligations required by this Certification, and
    b. Grant access to its books, contracts, computers, or other electronic systems (including medical records and documentation), relating to such downstream entity's compliance with applicable provisions under 45 C.F.R. Parts 155 and 156 in connection

with the duties and obligations required by this Certification, to HHS and its Office of Inspector General (or their designees), for the duration of the period of Agency's appointment pursuant to this Certification, and for a minimum of ten (10) years from the date Agency's appointment terminates.

5. Any contractor used by Agency shall furnish BlueCross with a copy of the pertinent contract language (including amendments thereto) between such contractor and any downstream entities, and among two or more downstream entities, as applicable, to demonstrate compliance with this entire Section. Such contract language (including amendments thereto) shall be furnished to BlueCross as soon as practicable following its adoption.
6. In the event that BlueCross or HHS determines that any contractor used by Agency, or any downstream entity with whom such contractor contracts, as described in this Section, has not performed satisfactorily the duties and obligations required by this Certification, BlueCross shall have the right to revoke such duties and obligations and terminate Agency's appointment, upon providing thirty (30) days advance notice and an opportunity to cure, to the extent that BlueCross determines, in its sole discretion, that such advance notice and opportunity to cure are feasible and proper under the circumstances.
7. The provisions of this Section shall in no way be interpreted as an assumption by BlueCross of legal liability for the actions of any contractor used by Agency or any downstream entities, including, but not limited to, malpractice or other liability.

## ~~IV~~V. LIMITATIONS OF AUTHORITY

It is understood and agreed that Agency has no authority, implied or otherwise, to:

1. On behalf of Companies, bind or obligate Companies to provide insurance coverage to any person or group. Coverage shall be effective only upon acceptance by the Companies, who reserve the right to decline any application;
2. Make, alter or discharge any contract;
3. Waive forfeiture;
4. Extend the time for payment, or allow waiver, of any premium;
5. Obligate Companies for payment of any debts;
6. Issue any receipt of any kind except as authorized by Companies;
7. Accept any past due premium;
8. Commingle any monies or funds received or collected on behalf of an applicant for the Companies' insurance policies with any Agency funds, nor establish any bank account to hold such funds;
9. Submit applications to the Companies on behalf of other Producers, except as set forth herein. If Producer submits applications on another Producer's behalf, all commissions paid or payable by the Companies to Agency or its designees for that policy shall be forfeited. Among other remedies, Companies may cancel this Agreement and offset forfeited commission against other commissions payable to Agency or its designees. No Producer shall solicit insurance for the Companies until Companies have approved his or her appointment to represent the Companies. Agency shall be responsible to the Companies for all business done by or entrusted to persons appointed by the Agency. The provisions of this Section shall not be construed in such a way that Agency or its Producers shall be prohibited from submitting applications or business produced by Agency's bona fide employees, provided, however, that Agency's employees are properly licensed and appointed with the Companies to produce applications of the type submitted;
10. Institute any legal proceeding involving Companies in any manner;
11. Use to the detriment of the Companies, any information about the business of the Companies, which Agency has obtained due to Agency's association with the Companies. This is applicable for the term of this Agreement and for a period of three (3) years thereafter. Agency recognizes that a remedy at law for any breach or threatened breach by Agency of this Section will be inadequate by its nature, and Companies shall be entitled to injunctive and other appropriate remedies if Agency violates this section.
12. Companies may, at its sole discretion and without notice, specify or limit those products that the Agency may solicit.

## ~~V~~VI. ASSIGNMENT

1. This Agreement and the payments accruing under it may not be assignable without Companies' prior written consent.
2. Any requests for transfers of this Agency Agreement must contain the following:
    a. An explanation of the primary business reason for wanting to transfer the Agency Agreement, i.e., inability of Agency owner to continue business for reasons such as retirement, moving out-of-state, disability, etc.; and
    b. The length of time that the proposed transferee has been doing business with the Companies.
    c. At the request of the Companies and within Companies' sole discretion, the Agency to whom the business will be transferred must be able to demonstrate both its ability to sell and retain business through its history with the Companies, and to demonstrate that it will be able to adequately service the business it wishes to purchase.
    d. The Agency, its owners, partners, shareholders, employees and Producers or sub-agents, must agree in writing to all the terms and conditions of this Agreement, as well as the Producer Appointment Agreement and the Commission Assignment Form.

3. In no event shall blocks of business be merged for purposes of increasing overrides.
4. The Companies reserve the right to cancel transferee's appointment to represent him or her, and to withhold commission payments, if they deem transferee is actively soliciting to place transferred business with another carrier.

## ~~VII. AGENCY STATUS~~

~~1. This Agreement shall not be construed as creating the relationship of employer/employee between Companies and Agency. The relationship of Agency to the Companies is and shall be that of an independent contractor. Within the scope of Agency's authority, duties and responsibilities, Agency shall exercise independent judgment as to the persons from whom applications for insurance are solicited and the time, place and manner of such solicitation.~~

~~2. Agency understands and agrees that the purpose of extended or available training courses, sales methods and materials, prospects, leads, or similar aids and services shall assist Agency in the conduct of Agency's business, but is not intended to give Companies control over Agency's time, direction and manner, or means by which Agency shall conduct Agency's business.~~

~~3. If Agency sells Medicare-related products, Agency understands that the sale of these products is subject to regulations set out by the Centers for Medicare & Medicaid Services, that all marketing is regulated by those regulations, and agrees to train or require training of all Producers or sub-agents supervised by Agency who engage in sales of these products.~~

~~4. Agency is neither required to devote full time to the performance of this Agreement nor perform the services personally. Agency is free to solicit business for other companies; however, other requirements may apply, including any other requirements listed in other appointment documents of the Companies, including the Producer Appointment Agreement and the Letter of Intent (if one has been signed).~~

## ~~VIII~~VII. COMPENSATION

1. Companies retain the right to change the commission rates and structure, including all new and in-force business, with 30 days prior notification, and such modified or replaced schedule shall apply to all other policies in force following the effective date of such modification or replacement.

~~1~~2. Agency shall receive commission (as defined in the Commission Schedule) in accordance with the terms and conditions of the Commission Schedule. The term "Commission Schedule" refers to that document created and maintained by the Companies that details the manner and amounts that an Agency will be paid for the sale of a particular product. In no event shall any commissions be paid to an Agency or Producer not licensed in the state of South Carolina or appointed with Companies.

~~2~~3. Commissions shall be payable only for so long as the Insured maintains a policy with Companies and Agency remains the "Agent of Record" for the Insured. In the event a policy or contract is cancelled, Agency shall repay to the Companies, on demand, the full amount of commissions paid on premiums not received or refunded. Companies shall have the authority to recover overpayments from future commission payments.

~~3~~4. In the event that an error is made in the calculation and/or payment of Compensation under this Agreement, regardless of who made the error or the reason for the error, the parties agree that the correction of the error shall be made retroactively for a maximum of twelve (12) months from the date the error was discovered by Companies. This section shall not limit in any way Companies' right to collect any indebtedness of Agency to Companies, through offset of compensation or otherwise, for reasons other than error in calculations or payments.

~~4~~5. Termination of this Agreement for cause shall immediately void the Companies' obligations under this Section. Agency agrees to repay to the Companies any and all amounts paid by Companies to the Agency on any business for dates of service after the effective date of any such revocation, termination or cancellation. Agency's duties of indemnification and confidentiality will remain in force for a minimum term of three (3) years following termination of this Agreement, or for the maximum period of time allowed or required by law.

~~5~~6. Agency agrees to fully disclose to his or her group clients, subscribers or applicants for insurance, all reportable compensation Agency receives from Companies to the extent and in the manner consistent with applicable federal or state laws, regulations and/or requirements or under any agreement with group clients, subscribers or applicants for insurance.

~~6~~7. Companies may offset against any claim for compensation hereunder any debts or charges now due or which may become due Companies from Agency at any time. Such debts or charges shall be a first lien against any commissions due Agency under this Agreement. In the event commissions due Agency are insufficient to discharge Agency's indebtedness, the balance due, if any, shall be a debt which Agency hereby assumes and agrees to pay.

~~7~~8. If a policy is cancelled by Companies at the request of the insured or applicant for any reason whatsoever, or if Companies rescinds a policy on the grounds of misrepresentation, Companies shall be the sole judge of Agency's commission interest in that policy.

## VIII. AGENCY STATUS

1. This Agreement shall not be construed as creating the relationship of employer/employee between Companies and Agency. The relationship of Agency to the Companies is and shall be that of an independent contractor. Within the scope of Agency's authority, duties and responsibilities, Agency shall exercise independent judgment as to the persons from whom applications for insurance are solicited and the time, place and manner of such solicitation.
2. Agency understands and agrees that the purpose of extended or available training courses, sales methods and materials, prospects, leads, or similar aids and services shall assist Agency in the conduct of Agency's business, but is not intended to give Companies control over Agency's time, direction and manner, or means by which Agency shall conduct Agency's business.
3. If Agency sells Medicare-related products, Agency understands that the sale of these products is subject to regulations set out by the Centers for Medicare & Medicaid Services that all marketing is regulated by those regulations, and agrees to train or require training of all Producers or sub-agents supervised by Agency who engage in sales of these products.
4. Agency is neither required to devote full time to the performance of this Agreement nor perform the services personally. Agency is free to solicit business for other companies; however, other requirements may apply, including any other requirements listed in other appointment documents of the Companies, including the Producer Appointment Agreement and the Letter of Intent (if one has been signed).

**IX. CONFLICT WITH LAW OR REGULATION**

If, at any time, the provisions of this Agreement conflict with any law, regulation or ruling of any applicable governmental entity, the Agreement may be modified by Companies or by a court having competent jurisdiction, without Agency's consent, to comply with such law, regulation or ruling.

**X. NON-WAIVER**

Failure of Companies to insist upon strict compliance with any terms of this Agreement or procedural requirements of Companies shall not be construed as a waiver of any such terms or requirements. All terms and requirements shall continue in full force and effect.

**XI. SUPERCEDES ANY PRIOR AGREEMENT**

This is the entire Agreement (including any other attachments or addendums) between the Agency and the Companies. This Agreement supercedes, terminates, and otherwise renders null and void any and all previous agreements (including Agency agreements or, to the extent applicable, any Producer Agreements or letters of intent) and any and all prior representations and statements of Companies, whether written, oral or implied, and now constitutes the entire agreement between the parties as of the effective date of this Agreement. Notwithstanding the foregoing, this Agreement does not affect or waive claims of any kind which the Companies may have against the Agency under any previous contract.

~~**XI. AMENDMENT AND MODIFICATION**~~

~~Companies reserve the right to amend and/or modify this Agreement unilaterally upon thirty (30) days prior notification, including the Commission Schedule or the Business Associate Agreement; otherwise, no amendment to this Agreement shall be effective unless in writing and signed by both parties. The Companies reserve the right to change or discontinue any form of policy now or hereafter in use. Such amendment or modification shall be binding on the Agency when notice thereof, properly addressed to Agency, has been deposited in the mail.~~

~~Companies may provide notification by means of letter, newsletter, printed materials, electronic mail or other media.~~

**XII. TERMINATION PROVISIONS**

This Agreement is made subject to the following provisions with respect to termination and commissions after termination~~.~~

; this ~~This~~ Agreement shall terminate:

1. At any time, by either party hereto, upon 30 days written notice.
2. In the event of the death of the sole proprietor or last remaining partner of the Agency.
3. By Companies for cause if, in Companies' opinion and at Companies' sole discretion, if Agency at any time:
   ~~(a)~~. Perpetrates any fraud or commits any act of dishonesty upon an applicant, policyholder, beneficiary of Companies;
   ~~(b)~~. Fails to promptly account for and pay to Companies money due according to Companies' records;
   ~~(c)~~. Twists or attempts to twist any policyholder or Agent of Companies;
   ~~(d)~~. Violates or breaches any term of this Agreement;
   ~~(e)~~. Fails or refuses to surrender upon demand records or property of Companies which may have come into Agency's hands as custodian or otherwise;
   ~~(f)~~. Agency's license to perform the functions required under this Agreement is suspended, cancelled or revoked for cause by the state of South Carolina or any regulatory body thereof;

(g). Fails to furnish proof of licensing satisfactory to the Companies within forty-eight (48) hours of a request by the Companies for such proof;
(h). Fails to maintain or provide proof of Errors and Omissions insurance coverage as required in this Agreement; or
(i). Unprofessional or inappropriate conduct of the Agency as determined by the Companies at its sole discretion.

4. The Companies reserve the right to cease paying commissions upon the effective date of cancellation under termination provisions or as directed by the South Carolina Department of Insurance.
5. The Companies reserve the right to terminate the appointment of any and all Producers or sub-agents, for any reason, or at the direction of the South Carolina Department of Insurance.
6. Upon termination of this Agreement, all books, supplies and documents containing the records of the business of the Companies shall be promptly delivered to the Companies. The Agency shall further allow the Companies full liberty to inspect and to take notes of all information as to the business of the Companies which belongs to the Agency.

## XIII. ADVERTISING, POLICY FORMS AND SERVICE MARKS

1. Agency shall not re-market or package the Companies' products without the express written consent of the Companies. Agency has no authority, implied or otherwise to advertise or otherwise use Companies logos, policies or other references, printed and/or electronic in any newspaper, periodical, circular, or other marketing communication materials, printed or electronic, except upon prior written approval of an officer of the Companies.
2. Agency understands and agrees that the names "Blue Cross" and "Blue Shield" and the Blue Cross and Blue Shield symbols and marks and all rights, titles and interests therein (including without limitation any service marks, copyright, patent, trademark and other intellectual property rights therein) (collectively, the "Marks") are the property of or licensed to Companies, and Agency and employees receive no rights, title or interests in or to the Marks except as expressly set forth herein. Agency shall not: (i) use, modify or alter the Marks; or (ii) alter, destroy or otherwise remove any proprietary notices or labels containing the Marks, in any manner, without the prior written consent of Companies.
3. Companies shall supply promotional materials and applications for policies and shall prescribe all policy forms and rates to be used in connection with performance under this Agreement. Agency agrees to use only those materials, applications, forms and rates provided by Companies. Agency shall not, and shall not permit its agents, sub-agents or employees to alter, modify or amend any promotional materials, applications, policy forms or rates provided by Companies. In addition, no circular, advertisement, letterhead, telephone directory advertisement or other matter or materials that includes the name of or refers to the Companies or the Marks, as defined below, shall be printed, published or used to include, but not limited to printed or electronic media, in any way, by Agency unless Companies has given advance written approval thereof.
4. Other than sales literature, all material that the Companies furnish for Agency's use is confidential information and shall not be unnecessarily distributed or disclosed by Agency, without Companies' written permission or except as may be required by law.
5. The Agency expressly acknowledges that this Agreement constitutes a contract solely between Agency and Companies. Blue Cross and Blue Shield of South Carolina is an independent licensee of the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield plans. (and is an independent corporation operating under a license from the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield plans.) The "Association" permits Blue Cross and Blue Shield of South Carolina to use the Blue Cross and Blue Shield service marks in the state of South Carolina, and Blue Cross and Blue Shield of South Carolina is not contracting as an representative of the Association. Agency further acknowledges and agrees that it has not entered into this Agreement based upon representations by any entity other than Companies. No person, entity, or organization other than Companies shall be held liable or accountable to Agency for any of Companies' obligations created under this Agreement. This paragraph shall not create any additional obligations whatsoever on the part of Companies or Blue Cross and Blue Shield of South Carolina other than those obligations created under other provisions of this Agreement. The Agreement is effective the day signed by a representative of Companies.

## XIV. REPORTS AND AUDITS

1. Agency shall maintain at its principal office, files and records concerning this Agreement and books and records of all transactions between itself, itsit's Producers, sub-agents, employees, Companies and the Individual/Group. These books and records shall be maintained in accordance with prudent standards of insurance record keeping. Companies acknowledgesacknowledge that it accepts properly-forwarded automated or electronic copies of files in lieu of hard copy files.
2. Agency shall maintain and may not destroy any and all books, accounts and records of Agency related to Companies' Policies, and the same shall be subject to audit and inspection by Companies or its duly authorized representative at all times while this Agreement is in force and for seven (7) consecutive years after termination of this Agreement. Companies may, at any time, make copies of or take extracts from such books, accounts and records, as it may deem necessary.
3. Agency shall fully cooperate with any audit or examination by any government or authorized agencies and shall allow access to books and records maintained by Agency pursuant to this Agreement. Agency shall notify Companies within onethree (13) business day of any such audit or examination subject to this Agreement. Companies shall have the right to audit Agency during the term of this Agreement and for a seven (7) year period thereafter.

**XV. LICENSES AND TAXES**

1. Agency shall maintain all licenses required by the Companies, the state of South Carolina, and/or local laws and regulations to engage in business as an insurance agency, or Agency.
2. Agency agrees to notify the Companies within one business day of any termination, suspension, or expiration of Agency's license, or of any license held by its Producers, employees, or sub-agents, or of any regulatory sanctions imposed against Agency, its Producers, sub-agents or employees. Upon request, Agency will furnish to the Companies written proof of licensing.

**XVI. AMENDMENT AND MODIFICATION**

1. Companies reserve the right to amend and/or modify this Agreement unilaterally upon thirty (30) days prior notification, including the referenced commission schedule(s). Companies may provide notification by means of letter, newsletter, printed materials, electronic mail or other media.
2. Blue Cross and Blue Shield of South Carolina approved the above Agreement on behalf of itself and its family of companies, subject to all the provisions herein.

**IN WITNESS WHEREOF**, Company and Business Associate execute this Agreement in multiple originals to be effective on the last date written below.

☐ I Accept, Electronic Signature. By selecting "I Accept" you are signing this document electronically. You agree your electronic signature is the legal equivalent of your manual/handwritten signature on this document. By selecting "I Accept" using any device, means or action, you consent to the legally binding terms and conditions of this document. You further agree that your signature on this document (hereafter referred to as your "E-Signature") is as valid as if you signed the document in writing. You also agree that no certification authority or other third party verification is necessary to validate your E-Signature, and that the lack of such certification or third party verification will not in any way affect the enforceability of your E-Signature or any resulting document between you and BlueCross BlueShield of South Carolina.

| **Agent / Agency Representative** | **Blue Cross and Blue Shield of South Carolina** |
|---|---|
| E-Signature: | By: |
| Title: Owner | Name: Stephanie DeFreese |
| Agency SCDOI#: 210987 | Title: Vice President, Agency Sales |
| Date: 06/16/2017 | Date: |
| **BlueChoice HealthPlan of South Carolina, Inc.** | **Companion Life Insurance Company** |
| By: | By: |
| Name: David Gwin | Name: Trescott N. Hinton Jr. |
| Title: Vice President, Sales | Title: President |
| Date: | Date: |